UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

COSTAS EFTHYMIOU,

        Plaintiff,

    v.

HEATHER LABONTE,

        Defendant.

Case No.  22-cv-04694-VC

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

N.E. is the twelve-year-old son of Costas Efthymiou and Heather LaBonte. He has lived almost his entire life in Cyprus, where his father has had full custody of him since his parents' separation in 2014. Last summer, N.E. came to the United States for a six-week visit with LaBonte in California. At the end of the visit, Efthymiou came to collect N.E. but was unsuccessful: N.E., who has autism, had become determined not to return to Cyprus, and LaBonte refused to turn him over.

Efthymiou promptly asserted his custody rights by bringing a petition under the Hague Convention on the Civil Aspects of International Child Abduction. The Hague Convention provides for the speedy return of children who are wrongfully removed or retained across international borders. Signatory nations—including the United States and Cyprus—agree to return children to their country of habitual residence so that the underlying custody dispute can play out in that country's courts. In ruling on a Hague Convention petition, a federal court is not authorized to adjudicate custody or determine the best interests of the child. Instead, a wrongfully retained child must be ordered returned unless one of the Convention's few enumerated exceptions is proven.

In December 2022, the Court held a five-day bench trial. As the parties had essentially stipulated that N.E. had been wrongfully retained under the Convention, the trial focused on the two affirmative defenses raised by LaBonte: the "grave risk" and "mature child" defenses.

**I**

**A**

N.E. was born in England in 2010 to Heather LaBonte and Costas Efthymiou. Ex. 7 at 7. Before the year was out, the family moved to Efthymiou's home country of Cyprus. Tr. 18.[1] They lived together until the parents divorced in 2014, at which point a Cypriot court granted Efthymiou full custody of their son. Ex. 2. LaBonte left Cyprus in 2014, but she returned the next year and lived with Efthymiou and N.E. between 2015 and 2017, and then lived nearby for another year. Tr. 482; Ex. 7 at 8. In 2018, LaBonte left Cyprus a final time. Tr. 41, 482. For the last four years she has lived in Petaluma, California. *Id.* at 9.

In the summer of 2019, N.E. spent six weeks with LaBonte in South Carolina, staying with LaBonte's mother (N.E.'s grandmother). But the COVID pandemic prevented the two from seeing each other in person for almost three years. *Id.* at 16. Instead, N.E. and LaBonte spoke by video call as often as four or five times per week. *Id.* at 9. N.E. also had a standing weekly video call with his grandmother. *Id.* at 9, 299.

In Cyprus, N.E. and Efthymiou lived in the village of Xylotymbou, Larnaca, near Efthymiou's parents and other family members. *Id.* at 439, 523. Xylotymbou is a village of about 4,000 people. *Id.* at 476–77. N.E. would often spend afternoons and evenings at his grandparents' house because of the demands of Efthymiou's job as a cyber security professional for the Cypriot government and, for at least some period, a second job. *Id.* at 488.

Sometimes Efthymiou would miss dinner, which was usually planned for around 7 p.m. *Id.* On March 3rd, 2022, for example, Efthymiou said to N.E. by text message that he would arrive at N.E.'s grandparents' house around 8 p.m. Ex. 231 at 7. The next day, Efthymiou again

---

[1] The trial transcript is available at Dkt. Nos. 76–80. Page citations are to the transcript's native page numbers.

said he would arrive late and that the family should eat without him. *Id.* at 9. On March 23rd, Efthymiou asked N.E. if he was okay spending the night at his grandparents' house, as he was stuck late at work. *Id.* at 20. And Efthymiou was late to get N.E. again on March 31st, arriving around 10 p.m. *Id.* at 23–24. Six weeks later, their texts show that Efthymiou got home one night after 4 a.m.—although it isn't clear whether this was expected, and N.E. had spent the night with his grandparents. *Id.* at 28. These messages may not reflect every night that Efthymiou got home late during this period, but they also show at least one night when Efthymiou was home early for dinner with N.E. around 6 p.m. *Id.* at 12.

Efthymiou was an active parent. He required N.E. to get his permission to install apps on his phone, and he managed his son's screen time. Ex. 231 at 32, 38, 41. The two of them played video games together. *Id.* at 1, 8, 24. Efthymiou was engaged in N.E.'s education and served as a member of his school's parent-teacher organization. Tr. 475. And he kept abreast of N.E.'s homework assignments to ensure that his son did his work, although he did not demand perfection. *E.g.*, Ex. 231 at 16 ("You can skip the poem if you want.").

N.E. performed well through primary school, which he completed in 2022. Tr. 42–43, 429; Ex. 15 at 3. For secondary school, both N.E.'s father and grandfather had attended the American Academy, a competitive private school in Larnaca, and the prospect of N.E. attending that school was discussed among the family for years in advance. Tr. 436, 477–78, 638. Efthymiou testified that he told N.E. to study hard for the entrance exam, but that it would okay if he weren't accepted. *Id.* at 502–03. To incentivize N.E.'s studies, Efthymiou promised to buy him a PlayStation 5 if he passed the exam (although Efthymiou had in fact already ordered it and planned to give it to N.E. whatever happened). *Id.* at 505. N.E. studied diligently for several months, and not only passed the exam but got an especially high score. Ex. 7 at 42. N.E. announced this proudly at school, though he also experienced stress about the exam and—like any young person—anxiety about the prospect of attending a new school without many of his friends. Ex. 15 at 3; Tr. 503–04. N.E. testified that he didn't want to go to the American Academy and that he would rather attend the local school. Tr. 638.

**B**

In June 2022, N.E. came to California to see LaBonte for the first time in years. His father brought him as far as Ireland and then handed him off to N.E.'s maternal grandmother for the remainder of the journey. Tr. 230. N.E. arrived in Petaluma on June 29th. *Id.* at 15. Both parents had signed off on a six-week visit. Ex. 4. Efthymiou planned to come to California on August 6th to collect N.E., and the two of them would depart the United States on August 9th. Exs. 4, 6.

There is no evidence that LaBonte planned to contest custody or that N.E. planned to object to returning to Cyprus as of his arrival. But the situation began to unravel in short order. Within a week, N.E. expressed a liking for Petaluma and an interest in coming to live in the United States when he got older. Tr. 44. LaBonte reminded N.E. that he had to return to Cyprus but said that they could talk with Efthymiou about how to fix any problems. *Id.* at 49. N.E. confirmed that, at least in their very first conversation on the topic, his mother told him that he had to go back to Cyprus. *Id.* at 644–45.

On July 10th, less than two weeks into the visit, LaBonte sent Efthymiou a three-paragraph message saying that N.E. had decided he wanted to live in Petaluma with her. Ex. 209 at 800.[2] She encouraged Efthymiou to look for work in California so that N.E. could "have both parents and be happier." *Id.* LaBonte felt their son had "outgrown the village" in Cyprus now that he was twelve. *Id.* She noted that she repeatedly told N.E. that "he has to go back," but that each time he said that "he wishe[d] he didn't." *Id.* In a second message, sent less than a minute later, LaBonte provided several more reasons why N.E. would be better off in Petaluma and why Efthymiou should come as well. *Id.* at 801. She stated that she was "surprised how many times [N.E.] said he wanted to live here," that he had said Efthymiou would never let him, and that he was scared to tell his father how he felt. *Id.* LaBonte told Efthymiou that she had "asked if he wanted me to say something to you for him," and that N.E. had accepted her offer. *Id.* LaBonte

---

[2] These messages were captured from Efthymiou's phone and therefore are marked with Cyprus dates and times. This opinion uses California dates and times throughout.

sent many additional messages along these lines to Efthymiou over the course of the evening and the next morning without a response. Eventually, LaBonte asked, "Are you alive?" *Id.* at 803. Efthymiou responded, "Asleep." *Id.*

The text message conversation between the two parents remained largely one-sided. In part, LaBonte was informing Efthymiou about their son's nascent hope to live with her in California and seeking to "open lines of communication" among the three of them. *Id.* at 802. "Things will not go the way he wants," she wrote, "but at least he will feel heard." *Id.* She relayed that she had asked what changes would make his life in Cyprus better and that she was trying to get him excited about starting at his new school. *Id.*

But the larger portion of LaBonte's messages was an array of reasons why N.E. should be allowed stay with her. She said N.E. preferred California to Cyprus because "people aren't picky about things," because his grandparents' "way of thinking" stressed him out, and because he didn't like being "dragged to social gatherings." *Id.* at 803. He wanted to be allowed to wear short-sleeve shirts in winter and did not like how much time he was spending with his grandparents. *Id.* at 804. He felt that people in Cyprus cared too much about others' opinions and were living in "1922." *Id.* at 805. While LaBonte disclaimed any influence over N.E.'s thinking, *see, e.g.*, *id.* at 802, 805, she quickly shifted from communicating her son's statements to adopting them herself. "A grandchild is not meant to spend that much time with grandparents, especially when they are living in another century," she wrote. *Id.* at 804. "You need to let him live in the 21st century." *Id.* "Your parents are too much for spending lots of time with. And when you do have a weekend off don't make him go to a birthday party he doesn't want to go to; spend that time with him." *Id.* "Let your son live like a regular person. That life there is extremely stressful for him." *Id.* at 805. LaBonte said Cyprus was not a good place for N.E. because it was a "social extravaganza" with "a million expectations and quirky social norms." *Id.* at 837. She further criticized Efthymiou and his family, alleged that N.E. was neglected, and suggested she could easily prevail in a custody dispute. *E.g.*, *id.* at 844. And she warned Efthymiou that if he did not agree to let N.E. stay, "he's going to hate you." *Id.* at 805.

Efthymiou declined to engage with LaBonte on the topic of N.E. staying in California, generally not responding to such messages at all. He did send terse messages about other matters, including N.E.'s excursions, reading habits, and diet. *E.g.*, *id.* at 806, 816, 827, 835. He also messaged her about reminding N.E. to answer his phone calls. *Id.* at 849–50.

About two weeks after her initial messages about N.E. staying, LaBonte sent Efthymiou several photos and said of N.E., "He's happy. Truly happy." *Id.* at 846. The next morning, Efthymiou messaged back, "I'm glad that he is having fun during his holiday there." *Id.* at 847. LaBonte responded almost immediately to ask how Efthymiou thought he would get N.E. on a plane home, adding that she hoped he was not planning to force N.E. to go, as he was "adamant." *Id*. N.E. threatened to scream if put on a plane, to push away any police officers, and to run away if returned. Tr. 49, 51. (LaBonte was especially alarmed by N.E.'s statement that he would push away the police because he is over six feet tall, despite his youth, and she feared how the police might react. *Id.* at 51.)

By July 30th, one month after N.E. arrived, LaBonte was adamant as well. She had begun arranging for N.E. to go to school in California, apparently at N.E.'s request; Efthymiou sent a message stating that he did not consent to N.E. attending a California school or "anything else than what we had planned." Ex. 209 at 857–58. He told LaBonte, "I trust that you will do the right thing and explain to him that he has to come back and that I will talk things through with him. These are difficult decisions that cannot be made just like that." *Id.* at 858. LaBonte again told Efthymiou that he could not force N.E. onto a plane. *Id.* Efthymiou responded right away: "All you need to do is ensure that his stuff is packed, and hand him over as planned and agreed on 9th August." *Id.* LaBonte replied: "Uh he's not going with you[.] And I'm not forcing him." *Id.*

## C

Over the summer, LaBonte became concerned about her son's health and hygiene, and she sought several types of medical care for him. She noticed that the left side of N.E.'s mouth was swollen and bright red. Tr. 18–19. He said it had been painful to chew on that side for over a

year and that he hadn't been taken to a dentist despite telling his father about the issue. *Id.* at 18.
(Efthymiou denied that N.E. told him about his mouth and noted that while N.E. had not seen a
dentist for some time because of the pandemic, he had an appointment scheduled for just before
his summer trip that was only canceled because Efthymiou tested positive for COVID. *Id.* at
429–31, 499. Efthymiou's sister Maria, the one other family member from Cyprus who testified,
also said she never heard N.E. complain about his mouth and that she never saw him having
trouble eating or chewing. *Id.* at 527–28. N.E. told the Court that he told his father and other
family members about his mouth multiple times, and that it had been hurting for about a year. *Id.*
at 632–35.) LaBonte brought N.E. to an emergency appointment where the dentist observed
severe swelling on his left gums and conducted a deep cleaning. *Id.* at 213–14; Ex. 220. The
swelling was significant enough that it almost certainly pre-dated N.E.'s arrival in California. *See*
Tr. 218–19. He had a follow-up visit two weeks later and was referred to a gum specialist
because his condition had not improved. *Id.* at 216. The specialist recommended regular daily
care, warned that surgical intervention might ultimately be necessary, and referred him on to a
pediatric dental specialist. *Id.* at 223–24; Ex. 222 at 2. Photos taken by the gum specialist
confirm how red N.E.'s gums were. Ex. 222 at 6. LaBonte testified that, as of trial, N.E.'s mouth
had improved somewhat, but was still a problem. Tr. 26–27.

LaBonte kept Efthymiou abreast of these dental visits and he was open to the idea that
N.E. needed such care. Efthymiou said that he would "continue whatever else needs to be done
over here," and asked that LaBonte "ask for a copy of the medical records from these visits, so
that we can have them over here." Ex. 209 at 809, 815. LaBonte agreed to do so and noted that
N.E. would need "serious daily attention for his teeth." *Id.* at 815. Efthymiou replied
immediately: "Like I said, whatever we need to do we'll do." *Id.* The parents squabbled about
getting N.E. an electric toothbrush, with Efthymiou becoming frustrated that LaBonte had
ordered one before he could look for a version with an electrical plug that would work in Cyprus.
*Id.* at 817–18.

In addition to his dental issues, LaBonte noticed that N.E.'s belly button was dirty and

crusted up and that he had dandruff. Tr. 27, 29. She also took N.E. to a chiropractor because he had back and knee pain. *Id.* at 31. N.E. felt that his family in Cyprus had been ignoring these problems and belittled him as "lazy" and an "old man" when he complained, unlike his basketball coach who allowed him to rest during practice when he felt pain. *Id.* at 32–33, 621–23. LaBonte also tried to get N.E. an additional pair of eyeglasses. Ex. 209 at 810. And she took him to the emergency room one night because he was having abdominal pains and she feared it could be appendicitis. *Id.* at 863. The issue turned out to be constipation. *Id.*; Tr. 451.

An important but less urgent concern of LaBonte's was that her son might have a mild form of undiagnosed autism. Ex. 32 at 7. LaBonte testified that she worked with autistic children for a decade earlier in her life. Tr. 35. She had wondered whether N.E. might be on the spectrum, a possibility she claims to have floated to Efthymiou. *Id.* at 34; Ex. 209 at 803. (Efthymiou denies that she had raised any such concern before this trip. Tr. 478–79.) LaBonte had observed that N.E. had coordination problems with shoelaces and zippers, avoided eye contact, felt very uncomfortable in large crowds, and had sensory issues with loud sounds and certain kinds of touching. *Id.* at 33–35, 51, 102. LaBonte did not have N.E. evaluated for autism at that time, partly for fear of angering Efthymiou—who controlled whether N.E. would be allowed to visit her in the future. *Id.* at 58.

### D

Efthymiou remained in regular contact with N.E. during his visit and spoke to him a few days after LaBonte's messages about his desire to stay. While Efthymiou didn't express any willingness to let N.E. stay in California, he did try to talk with N.E. about his feelings and what was bothering him. *See, e.g.*, Tr. 446. According to Efthymiou, N.E. was initially reluctant to discuss what LaBonte had messaged Efthymiou about. *Id*. at 446–47. But he became more aggressive toward his father around July 20th (three weeks after his arrival). *Id.* at 447. Efthymiou asked N.E. to express what he was feeling in his own words, but N.E. would only say something to the effect of, "everything that mom has told you in her messages." *Id* at 447–48. Efthymiou told N.E. that he was talking about very big, important feelings that they should

discuss face-to-face. *Id.* at 448. On further calls over the last few weeks of the planned visit, Efthymiou sometimes thought that N.E. understood they were waiting to talk in person, but then he would accuse Efthymiou of refusing to discuss the topic. *Id.* at 450. Efthymiou's position was consistent: He would discuss any of N.E.'s complaints or desires face-to-face once he arrived. *Id.* at 74, 675.

When Efthymiou arrived in California on August 6th, LaBonte brought N.E. to a Subway restaurant and waited in her car while N.E. and Efthymiou met and talked inside. *Id.* at 77. The three of them then drove to the motel where Efthymiou would be staying, and N.E. and Efthymiou again spoke alone inside for about an hour. *Id.* at 78–79; 456. LaBonte testified that after these conversations N.E. felt Efthymiou was still refusing to discuss the possibility of N.E. staying in California. *Id.* at 78–79. According to Efthymiou, however, N.E. had asked if they could discuss "everything" the next day instead. *Id.* at 456.

The three met for lunch the following day but did not have a productive discussion. *Id.* at 456–58. N.E. insisted on speaking English, and (according to Efthymiou) LaBonte interrupted "almost constantly" and did not give the two a chance to speak in private. *Id.*

The following day, August 8th, they again met for lunch at a restaurant where Efthymiou spoke with N.E. in Greek for several hours. *Id.* at 80, 458, 680. Efthymiou told N.E. that he could tell his mother all about their conversation afterward, as LaBonte does not speak Greek, but he thought it helped N.E. to relax and express himself and it prevented LaBonte from interjecting. *Id.* at 457–58. The conversation was mostly positive, and N.E. finally articulated at least one of his complaints in his own words, saying that his grandmother in Cyprus was trying to "control [his] brain" by making him wear matching clothes. *Id.* at 459–60. Efthymiou told him he was getting older and could wear whatever he wanted day to day. *Id.* Despite the more natural and easy conversation, later that day N.E. sent angry messages saying that their lunch had been horrible and a waste of time. *Id.* at 460; Ex. 231 at 72. "I am mad that you are putting me through this," he told his father. Ex. 231 at 72.

Efthymiou responded at length that evening: "It was very good that we discussed some

issues and you know that there is still a lot more that we need to discuss, because it is important for us to understand each other well and to be a good team together with this important stuff. It is also true that these are very difficult and [big] issues that need plenty of time to be discussed." *Id.* He remained firm that they would be leaving the next day, but said that he would have time off from work so he could "continue to discuss all these issues with you so that we understand each other in the best way possible." *Id.* "The court orders say that I have custody and the responsibility and obligation to take care of you and look after you. I do understand that you miss mum and we will find ways to make that better." *Id.* Efthymiou offered to meet up again that night or in the morning. "I can come and get you for an ice cream and we can talk. This will be good for us both. We must do all of this in the right way. I love you very much and want to hear everything you have to say about any [topic] in our life, and I will always be here for you." *Id.* at 73. To these messages, N.E. replied: "I HAVE TOLD YOU OVER AND OVER THAT I MADE THE DECISION NOT TO GO BACK TO CYPRUS!" *Id.*

In the morning, N.E. messaged to say he would "resist like hell." *Id.* Efthymiou said he would be there at noon to pick him up, and reminded N.E., "I want you to know that I love you more than anything, and that I am here for you. There is still a lot for us left to discuss and understand." *Id.* N.E. replied: "No," and then, "I hate you." *Id.*

**E**

That day, the three met at Buffalo Billiards, a pool hall in Petaluma, for the long-scheduled August 9th handoff. LaBonte had tried to pack N.E.'s suitcase the night before, but N.E. insisted that he wouldn't be leaving and was distressed by her packing, unable to understand why his father would need to take his things if he himself stayed behind. Tr. 82, 722; Ex. 209 at 872. LaBonte ultimately packed the suitcase with only some books, a headset, and some plastic bags. Tr. 82, 722–25; Ex. 13. She also slipped some of N.E.'s clothes into her car without his knowledge. Tr. 82–83. At this point, however, LaBonte did not have either of her son's two passports. He claimed to have thrown them away. *Id.* at 81; Ex. 209 at 872. During the trial, N.E. explained that he had hidden the passports underneath his PlayStation so that his father

could not take him back to Cyprus. Tr. 624–26.

Efthymiou was unhappy to discover that N.E.'s suitcase was nearly empty, and he took pictures of it. *Id.* at 89–90; Ex. 13. N.E. still wanted to discuss staying in California, and Efthymiou still refused to entertain the idea. Tr. 90. The back-and-forth became loud as LaBonte accused Efthymiou of kicking her out of Cyprus years before and accused his family of wanting to beat N.E. *Id.* at 463–64. N.E. became agitated and LaBonte encouraged them all to go outside. *Id.* at 90. The fresh air didn't change the situation, and eventually an observer called the police (though there was no physical altercation of any kind). *Id.* at 92. With the parties at an impasse, LaBonte asked if they could take a break and talk in a few hours, but Efthymiou said he had to go, and left. *Id.* at 92–93.

N.E. stayed with LaBonte, who enrolled him in public school a few days later. *Id.* at 94; Ex. 26 at 4. Efthymiou soon visited the school to object to his son's enrollment without his permission, and ultimately N.E. began attending an online school called Connections Academy. Tr. 95, 611–12.

Efthymiou filed this Hague Convention petition a week after the failed handoff. He has been staying with a friend in California while pursuing this case (other than a brief trip to Canada to comply with his visa). *Id.* at 471. As of trial in mid-December, Efthymiou had not seen N.E. since August 9th. *Id.* at 428. In the days after their last meeting in Petaluma, he messaged N.E. repeatedly to say he loved him and to ask what he was doing. Ex. 231 at 73. N.E. said that he wanted Efthymiou to support his decision. *Id.* In all caps, he called his father a "bastard" and told him to "go to hell." *Id.* at 74. He said that "unless you allow me to stay here I have nothing to say to you" and called him a "terrible father." *Id.* A representative response from Efthymiou went: "I will always love you and I will always be here for you. As always in our life, anything I do is that which I believe is best and right for you, even if as things are now it is difficult for you to understand this." *Id.* Efthymiou repeatedly implored N.E. to meet with him so they could talk more or just spend time together. *Id.* at 74–89. N.E. refused. *Id.*

N.E. explained to the Court that he did not feel comfortable with his father after the three

weeks during the summer when he perceived that Efthymiou was refusing to discuss the matter. Tr. 618. He said that he would be willing to talk with his father if he would be "positive" about N.E. staying. *Id.*

LaBonte maintains that it has been N.E.'s decision not to see his father since early August and that she believes it is neither N.E.'s nor her responsibility to repair N.E.'s relationship with Efthymiou. *Id.* at 619, 718.

## II

In September, after this case was filed, LaBonte had N.E. professionally screened for autism. Dkt. No. 53-2 at 1. Two medical professionals, Dr. Patrick MacLeamy and Cynthia Vergara, interviewed LaBonte and N.E. by video call and produced a written report. Their assessment concludes that there is a high probability that N.E. has autism. *Id.* at 11–12. It is a diagnostic report, so it has only general recommendations about what sort of specialized services or educational opportunities, if any, N.E. might require. Tr. 381–82.

MacLeamy and Vergara did not speak with Efthymiou or otherwise get information from Cyprus, although they were aware that there was a custody dispute. *Id.* at 129, 132–33. Vergara readily acknowledged that it was "always useful" to get information from both parents, but she noted that, more often than not, evaluations are done with input from only one parent. *Id.* at 127. LaBonte was present for the entire interview with N.E., although Vergara did not think it affected his answers or behavior beyond making him less anxious. *Id.* at 135. Both medical professionals testified convincingly that their own observations of N.E. aligned with the information they received from LaBonte, and that they had high confidence in their conclusions. *Id.* at 134, 140, 370, 377. Vergara screens children for autism full-time, and since the beginning of the COVID pandemic about half of these screenings have been conducted by video call. *Id.* at 138–39. Neither she nor MacLeamy saw a need to conduct a follow-up interview in person. *Id.* at 139, 372.

Efthymiou disputes that his son has autism and finds the diagnosis "puzzling." *Id.* at 474. He has observed N.E. in many different social gatherings and did not perceive him as anxious; he

has not noticed any aversions to loud sounds (indeed, the two would listen to loud electronic music together); and he did not sense that N.E. avoided eye contact. *Id.* He noted that N.E. would run around constantly at birthday parties and would stop at the village coffee shop to "talk to the old people there playing backgammon." *Id.* at 697–98. Efthymiou also noted that N.E. has done well in school and that none of his teachers or doctors in Cyprus have ever suggested that he has autism. *Id.* at 429, 434–35. Efthymiou also contests the validity of a screening done via video call and without input from N.E.'s teachers or his family in Cyprus, including Efthymiou himself. His own expert believes that N.E. does not have autism and testified that the assessment was the work of a "hired gun." *Id.* at 410.

Near the end of the trial, however, Efthymiou expressed openness to the idea that N.E. has autism and special needs that he had not previously appreciated. He acknowledged: "I'm not an expert. I'm not a psychologist. So if I do get him back home . . . I would want to get him reevaluated and with sources from all around . . . including Heather to get a proper full evaluation." *Id.* at 699. And if that evaluation confirmed that N.E. has autism, he would get him "anything that can help him go through life and be more successful and be more functional." *Id.* When asked by the Court what he would do if he were told that the American Academy is not the right environment for his son, Efthymiou responded without hesitation: "Then we would find what the right environment is. There is no sense in him being somewhere where he won't be able to do well." *Id.* at 700.

The Court observed N.E. in chambers, where he answered questions from the Court and counsel for both sides without his parents present. N.E. was understandably subdued, but he was composed and calm through several hours of questions from strangers. That time observing N.E. (after having had the benefit of testimony and reports from the experts) confirmed that he is on the spectrum—it is not a close question.

### III

The Hague Convention provides for the return of children wrongfully abducted or retained across international borders. Hague Convention on the Civil Aspects of International

Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670 (Convention). Both the United States and Cyprus are signatories to the Convention, and it is implemented in the United States by the International Child Abduction Remedies Act. 22 U.S.C. §§ 9001 *et seq*. District courts have concurrent original jurisdiction over actions brought under ICARA. § 9003(a)–(b).

In adjudicating a petition under the Hague Convention, a court may only decide whether the child should be returned to their country of habitual residence. Both the treaty and the statute explicitly preclude courts from making a final custody determination. Convention art. 19; § 9001(b)(4). The question at hand is where any further custody dispute over N.E. should play out, not whether living in one country or the other, or with one parent or the other, would be in his best interests.

A petitioner must establish a prima facie case of wrongful retention by a preponderance of the evidence. § 9003(e)(1). They must show that the retention was in breach of their custody rights in the child's country of habitual residence, and that at the time of the child's retention those custody rights were actually exercised or would have been so exercised but for the retention. Convention art. 3; *see also Mozes v. Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001), *abrogated on other grounds by Monasky v. Taglieri*, 140 S. Ct. 719 (2020).

LaBonte and Efthymiou have stipulated to nearly all of this, agreeing that LaBonte retained N.E. on or about August 9th; that Cyprus was his country of habitual residence at that time; and that Efthymiou was exercising his custody rights as entered by a Cypriot court. Dkt. No. 42. Even absent a stipulation, the Court would find those facts based on the record. The only outstanding element of Efthymiou's prima facie case—whether the retention was in breach of his custody rights—is not really in dispute. Efthymiou has remained in the United States while trying to recover his child, but he has not been able to make any of the countless decisions parents make every day. Tr. 428. Indeed, he has not even seen N.E. since August 9th. *Id.*

LaBonte had temporary custody of N.E. for six weeks. She had a responsibility to return N.E. to Efthymiou's custody on August 9th, and she didn't. LaBonte suggested on the stand that N.E.'s height means she can't force him to do anything, but a parent of a twelve-year-old is

expected to have the ability and willingness to force the child to do something they are strongly resisting. Efthymiou has clearly made out his prima facie case of wrongful retention under the Hague Convention. Unless one of the two treaty exceptions pressed by LaBonte applies, the Court must order N.E. returned to Cyprus.

## IV

### A

LaBonte first urges the Court to decline to order N.E.'s return to Cyprus because there is a "grave risk that . . . return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Convention art. 13(b). By statute, this "grave risk" exception must be established by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A). The exception must be "narrowly drawn, so as not to impair the Convention's general policy" of deterring wrongful retentions in the first place and facilitating the swift return of children when such retentions do happen. *Colchester v. Lazaro*, 16 F.4th 712, 715, 718 (9th Cir. 2021). The risk must be "grave, not merely serious." *Gaudin v. Remis*, 415 F.3d 1028, 1036 (9th Cir. 2005), *abrogated on other grounds by Golan v. Saada*, 142 S. Ct. 1880 (2022). That means the exception is not triggered by poverty or a generally lower standard of living, such as a lack of running water, plumbing, refrigeration, or other common comforts. *Cuellar v. Joyce*, 596 F.3d 505, 509 (9th Cir. 2010). It is not triggered by occasional accidents that have befallen a child in the past, or by speculation about whether a parent may or may not have been neglectful. *Id.* at 509–10. Such considerations would lead a court astray from its limited mandate and into the question of the child's best interests. Further, while the Convention's text is not very precise, a grave risk is best understood as involving both the probability and magnitude of harm. *See Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 377 (8th Cir. 1995). What probability is necessary may vary based on the type of harm alleged, but the harm must always be quite significant. Finally, "the grave-risk inquiry should be concerned only with the degree of harm that could occur in the immediate future," because a return under the Convention is only a "provisional, short-term remedy" that does not preclude an actual custody proceeding in the child's country of

habitual residence. *Gaudin*, 415 F.3d at 1036.

LaBonte has not come close to establishing a grave risk of physical harm by any standard, let alone by clear and convincing evidence. N.E.'s dental issues deserve attention, and Efthymiou probably should have noticed them earlier. But many children did not see a dentist during the first years of the COVID pandemic, and N.E. had a dentist appointment scheduled for just prior to the summer trip. Tr. 429–30, 499. That visit was only cancelled because Efthymiou tested positive for COVID. *Id.* at 429–30. And based on Efthymiou's contemporaneous response to LaBonte's concerns, it's clear that he will ensure N.E.'s dental problems receive the further attention necessary.

The other physical concerns raised by LaBonte or N.E., including his dirty belly button, dandruff, and knee and back pains, do not in and of themselves present a grave risk of physical harm. Nor does the combination of these things permit an inference of neglect that could lead to some other physical harm. That is true even if N.E. really did tell his father and relatives about his mouth and other issues, as parenting mistakes do not amount to a grave risk of harm. Contrary to LaBonte's characterization, Efthymiou is anything but an absentee father. He has a demanding job, and he may be imperfect. Like any working single parent, sometimes he misses dinner. But he cares enormously about his son (indeed, he has remained in this country for the many months that this dispute has taken), and it is an insult to suggest that his parenting puts N.E. at a grave risk of physical harm.

The question of psychological harm is more difficult because of N.E.'s autism. This is not a case where a child with autism would be harmed by being torn away from a therapy program helping them develop toward an independent life, both because N.E. is not in any such program and because he was doing well in Cyprus. *See, e.g.*, *Ermini v. Vittori*, 758 F.3d 153, 166–67 (2d Cir. 2014). But there are a few reasons to worry that N.E. will suffer psychological harm if he is returned.

First, he has become entrenched and is fearful of returning. When asked how he would feel if he were ordered to return to Cyprus, N.E. said he would "feel completely collapsed" and

"very sad, very angry . . . very angry and very broken down." Tr. 648. He could not remember anything he liked in Cyprus or anything he liked about his father. *Id.* at 650–51, 665. And he worries that he will never be allowed to come back to visit LaBonte. *Id.* at 201. As LaBonte's expert, Dr. Jacqueline Singer, testified, it would be "problematic" and emotionally difficult for N.E. to be made to return to the custody of a parent with whom he is not on good terms. *Id.* at 304. A common feature of autism is rigid thinking, *id.* at 273, so it would be foolish to predict that N.E. will totally abandon his resistance and revive his previous relationship with his father promptly upon arriving back in Cyprus. (Efthymiou's expert predicts precisely that, but his assertion is based on his incredible belief that there is no way N.E. has autism. *Id.* at 410–11, 420–21.) There is *some* chance that will happen—it does seem that N.E. quickly returned to feeling comfortable with his father when they had a chance to speak Greek for a few hours, for example—but it is not the most likely outcome.

Second, there is reason to think that that the environment in Cyprus is less in tune with his needs as a child with autism. There is credible evidence that N.E. finds some of his grandparents' comments quite upsetting (although his grandparents may be well-intentioned and unaware of how he feels). Most importantly, it is concerning that Efthymiou is so unwilling to acknowledge the obvious fact that N.E. has autism. It may be "mild" autism, as LaBonte thought. Ex. 32 at 7. N.E. was clearly doing well in Cyprus, was admitted to a competitive school, and is generally high functioning. But one need not spend much time with N.E. to suspect that he has autism. And it should be obvious to Efthymiou that his own expert's testimony was neither reliable nor credible. Faced with a reliable and credible report from MacLeamy and Vergara, it's worrying that Efthymiou still has doubts.

But LaBonte has not shown a *grave* risk of psychological harm. Courts must be careful about giving too much weight to harm resulting from the return itself, as opposed to conditions in the other country. It can be "very serious error" to deny return based on psychological harm stemming from the actual return, as parents must not be allowed to gain an advantage from wrongfully retaining a child. *Cuellar*, 596 F.3d at 511.

17

It seems to go too far to say that the trauma of return can't be considered at all in this case, insofar as it's a function of N.E.'s autism, and insofar as his desire not to return developed during a lawful visit. But it must not be given too much weight, especially in light of LaBonte's role in this saga. It is likely that the initial idea of staying was N.E.'s; it would only be natural for any child in his position—seeing his mother in person for the first time in years—to wonder aloud about staying. It is evident that LaBonte was not scheming to keep N.E. from the outset, and she initially reminded him he had to go home at the end of the summer. But soon after N.E. expressed interest in staying, LaBonte was on board. She quickly turned from insisting N.E. must return to insisting he should stay. As discussed more fully in the next subsection, her conduct (including her misplaced view that she could not "force" her twelve-year-old son to do anything) influenced N.E.'s thinking on the matter and contributed to his entrenchment. She bears significant responsibility for N.E.'s refusal to entertain the possibility of going home, and to this extent the Convention prohibits the Court from counting that "psychological dislocation" against Efthymiou. *Id.* Indeed, N.E.'s entrenchment has been exacerbated by LaBonte's inability or unwillingness (or both) to help Efthymiou repair his relationship with his son following the cancelation of their return to Cyprus.

It is clearly proper to inquire into whether the conditions in Cyprus, as opposed to the return itself, could cause N.E. psychological harm. LaBonte made no attempt to show that Cyprus or Xylotymbou lack the services to care for a child on the spectrum, instead arguing that Efthymiou had not and would not provide proper care for N.E. While Efthymiou's reluctance to admit that N.E. has autism is troubling, he testified convincingly that he is open to the possibility. He testified that he would seek to confirm the evaluation that LaBonte had arranged. And he testified that he would get N.E. whatever services he might need to thrive—including, if necessary, withdrawing N.E. from the American Academy and finding a different school. It is clear that Efthymiou is a good father. He cares about his child. He is desperate to have him back. He may be a more traditional parent than LaBonte; he may be less attuned to his son's emotional needs. His work requires him to leave N.E. with his grandparents, who may be even more

traditional and even less attuned. But Efthymiou has been raising N.E. for his entire life without severe psychological harm befalling him, and the Convention limits the inquiry to the relatively short period until custody proceedings can be concluded in the country of habitual residence. To decide that Efthymiou's parenting presents a grave risk of psychological harm to N.E. would require setting aside the evidence in favor of speculation.

The final part of the Convention's grave-risk exception states that a Court may decline to return a child if it would place the child in an "intolerable situation." Convention art. 13(b). Exactly what beyond physical or psychological harm would constitute an "intolerable situation" is unclear, especially given the need to construe the exception narrowly. But whatever the best way to frame it, this aspect of the grave-risk exception is also not met. N.E.'s life in Cyprus with Efthymiou is not intolerable.

**B**

The second basis on which LaBonte seeks to prevent N.E.'s return is the "mature child" defense. The Hague Convention permits a court to decline to return a child if "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Convention art. 13. This exception must be established by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2)(B). Like all of the Convention's exceptions, this one is narrow. *See Cuellar*, 596 F.3d at 508.

Although the Hague Convention does not apply to children once they turn sixteen, it sets no threshold age at which a child's views may be considered. Convention art. 4. (For comparison, California law presumptively requires courts hearing custody matters to consider the views of a child fourteen years of age or older. Cal. Fam. Code § 3042(c).) A court hearing a Hague Convention matter may "consider[]" a child's objections and still order them returned, *see Mozes*, 239 F.3d at 1076 n.23, but a child's views may themselves be dispositive, *Gaudin*, 415 F.3d at 1037 & n.3. Especially when a child's objection would be the sole reason for declining to order them returned, courts "should exercise caution . . . to ensure that statements made by the child[] reflect their own, considered views," rather than views received from the parent that

19

wrongfully retained them. *Id.*; *see also Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 278–79 (3d Cir. 2007). A key purpose of the Convention, after all, is deterring parents tempted to take or keep their children across international borders.

It is clear that N.E. objects to returning to Cyprus. He feels that his father and his other family in Cyprus ignored his complaints about his mouth, knees, and back. Tr. 621. He didn't like being called lazy or an "old man" by his grandparents. *Id.* at 621–22. He feels that his grandparents have many rules that cause him stress. *Id.* at 193–94. He says his father "would yell a lot" and disagree with him in an "angry voice" that made him unable to respond. *Id.* at 622. He felt very uncomfortable at large gatherings and the many birthday parties he attended. *Id.* at 623–24. He feels his father didn't spend enough time with him. *Id.* at 624. He believes his father would not make any changes to their life in Cyprus, in part because he thinks Efthymiou does not believe him regarding his various physical pains and in part because Efthymiou previously promised to work less but didn't. *Id.* at 65, 649.

N.E. also affirmatively wants to stay in Petaluma. In California he feels "comfortable" and "happy," and he thinks that getting to stay would be "the greatest thing that ever happened to [him]" because he could "finally be happy." *Id.* at 650. He likes going to the dog park, watching television, and driving around the town with LaBonte. *Id.* at 659. He likes how many dogs there are. *Id.* at 616. He likes that the teachers at his online school try to make kids feel relaxed. *Id.* at 614. Most importantly, in Petaluma he feels heard. *Id.* at 208–09. He likes that his mother will "compromise" with him. *Id.* at 646. (He noted that she sometimes makes him do things he is a little uncomfortable with, but not things he was "very, very uncomfortable with." *Id.* at 664–65.) And he feels these things strongly: On multiple occasions, N.E. has said that he might run away if returned to Cyprus. *Id.* at 649; Ex. 209 at 837.[3]

At least one court has held that a child's reasons for liking their current place of residence

---

[3] LaBonte suggests that N.E. could come to physical harm were he to run away from Efthymiou's custody, in part because she worries about trafficking near Cyprus's border with Turkey. Tr. 50. That theory is far too speculative to establish a grave risk of harm by clear and convincing evidence.

are not, strictly speaking, particularized objections to being returned to their country of habitual residence. *See, e.g.*, *Tsai-Yi Yang*, 499 F.3d at 279. This distinction seems unnecessarily artificial, since a reason for liking one place can always be reformulated as a reason for comparatively disliking a different place. True, if N.E. expressed merely positive reasons to stay in Petaluma, that might be a mere preference rather than an objection to being returned. But N.E. has articulated objections to being returned that are different from his reasons for liking Petaluma.

In articulating his concerns, however, N.E. has been using LaBonte's language in a way that calls into question whether his position is the result of consideration by a mature child. Two particular examples stand out. First, both LaBonte and N.E. told Efthymiou that returning to Cyprus would "break" him. LaBonte's message warned that N.E. "is going to break if you somehow get him back there." Ex. 209 at 838. N.E.'s own message is remarkably similar: "If you force me to go, it would mentally break me and you would basically lose me." Ex. 231 at 65. Both messages were sent on the same day. (LaBonte also previously used this word in the same way, telling Efthymiou that it would "break" *him* if N.E. decided to move to California later in life, as part of her effort to convince him to look for work in California now. Ex. 209 at 801.)

Second, both LaBonte and N.E. used variations on the phrase "psychologically damaging." LaBonte sent Efthymiou two messages about a week apart saying that forcing N.E. to return to Cyprus would be "mentally damaging" or "psychologically damaging." Ex. 209 at 859, 870. In between, LaBonte sent another message that purported to quote N.E. expressing concern about his paternal grandmother's care of a baby that would soon join the extended Efthymiou family: "When Yiayia takes care of [the baby] it will get psychological damage too." *Id.* at 868.

N.E. expressed other ideas that undoubtedly came from LaBonte. In particular, the idea of Efthymiou moving to California and getting a job there appears both in LaBonte's initial salvo and again in one of N.E.'s messages to his father a few weeks later. Ex. 209 at 800–01; Ex. 231 at 65 (N.E.: "I personally believe that it would be better for you in California because you could

have a great job that would not be that pressuring as it is back in Cyprus.").

LaBonte makes the point that English is N.E.'s second language, which may cause him to choose different words than a native speaker. Tr. 17, 714. That is a fair point, but the messages suggest far more than a child picking up on his parent's language or expressing himself idiosyncratically. They make it clear that LaBonte was working with N.E. to develop the case for staying—dramatizing returning to Cyprus as an experience that would "break" him and characterizing the stress he felt from things his grandparents said and did as "psychological damage." Even if N.E. has come to hold these views as his own, this evidence, especially his parroting of LaBonte's language, weighs against a conclusion that N.E.'s objections are those of a mature child. A mature child might well think over a parent's comments. It wouldn't have been surprising for N.E. to ask his father about the possibility of him getting a job in California, for example. But LaBonte's words and ideas flowed so directly through N.E. that Efthymiou was receiving essentially identical messages from each of them simultaneously. That is the mark of an immature child adopting his parent's views instead of coming to his own.

Turning to the substance of N.E.'s objections, many of them are the sort of reasons any twelve-year-old would give for liking Petaluma or for disliking Cyprus. The joy of seeing many dogs is an understandable reason for a young child to like one place over another. Not having to start at a scary new school is an equally unsurprising reason. The same goes for wishing he didn't have to spend so much time with his grandparents and that his father would work less. But N.E. is not weighing his options with any appreciation for the tradeoffs or the magnitude of the decision. *Cf. In re Randelovic*, No. 22-cv-00400, 2022 WL 3715810, at *1 (D. Or. Aug. 29, 2022) (finding that a child was mature in part because she had "struggled with the knowledge that she [would] disappoint one parent or the other with her decision"). N.E. cannot identify anything he liked about Cyprus, other than a vague sense that he liked his house. Tr. 650–51. He said he wouldn't miss anything about Cyprus, including his friends (as he could still communicate with them by phone and play video games with them online). *Id.* at 657. He sees absolutely no benefit to attending the American Academy in Cyprus, because he would have to

wake up early and because he is sure it would be a high-pressure environment (although he has never attended). *Id.* at 652–53.

He could not name one thing he didn't like about his mom. *Id.* at 665. He could not name one thing he liked about his dad. *Id.*

When directly asked, N.E. acknowledged that his father loves him very much. *Id.* at 647. He also acknowledged that Efthymiou is trying to do what he believes is best for him. *Id.* at 647–48. But he fails to grasp why his father might disagree with him. He also does not seem to have integrated all of his own thoughts. For instance, his grandparents' comments are a core reason he wants to stay, but when asked whether he felt comfortable at his grandparents' house, he answered, "sometimes yes and sometimes no." *Id.* at 636. Similarly, N.E.'s view that he would miss nothing about Cyprus is at odds with his connection with his family there. When N.E. went to the emergency room in early August with abdominal pain—less than a week before Efthymiou arrived and well after he began insisting on staying in California—he wanted to talk with his Cypriot family for comfort. *Id.* at 451–54; *see also* Ex. 10. Those examples contrast sharply with his insistence that there is nothing good for him in Cyprus. He is either exaggerating and flattening his experience in Cyprus in a bid to stay, or (more likely) he is basing his decision on a few entrenched negative feelings. Either is evidence of immaturity.

Similarly, when N.E. says that he isn't listened to by his father, he is deploying a mature concept in an immature way. Efthymiou does listen to his child. Their messages are replete with examples of Efthymiou wanting to know what his son is feeling, in his own words; with reminders that he loves him and wants to understand and wants to talk. But Efthymiou is under no obligation to entertain letting N.E. stay in California. When Efthymiou and N.E. did talk, N.E. was disappointed not because his father wouldn't have a conversation, but because his father wouldn't give him what he wanted. To feel such disappointment is natural at any age. But N.E. never seems to have really understood that he is asking his father to relinquish custody after twelve years, and ultimately it is N.E. who is not willing to have a conversation. He has refused to see his father since August 9th, and he does not want to speak to him unless it is part of an

arrangement that would let him stay in Petaluma. Tr. 618. As Singer, LaBonte's expert psychologist, put it, he has decided he is "finished with the relationship." *Id.* at 303. (Though she does not think he has passed "a point of no return." *Id.* at 303–04.) That reaction is immature and further counsels against deferring to N.E.'s wishes.

N.E.'s autism helps explain how he feels. It should go without saying that a child with autism may be mature enough to object to being returned under the Hague Convention. As Singer explained, N.E.'s reasons may seem thin, but his emotional reaction to certain experiences may be much different than that of a non-autistic child. *Id.* at 309–10, 312. He "was able to articulate specifically the ways in which he felt being here in the care of his mother versus the way that he experienced being cared for by his father and grandparents." *Id.* at 298. There is little doubt that N.E. feels more comfortable with his mother in Petaluma than with his father in Xylotymbou, and the fact that his autism is a significant reason for that doesn't mean his opinion is not worthy of consideration.

But his autism does not change the conclusion. Even LaBonte's expert was clear that N.E. has not reached a level of maturity at which his views should be dispositive. *Id.* at 314. His thinking is undoubtedly rigid, which again is a feature of autism. He gets "stuck into miniscule details" and comes back again and again to the same points, ones that many people might find unimportant. *Id.* at 299–300. He developed an idea about staying in California and has dug himself in, losing hold of things he surely once knew (like anything he likes about his father) as he fixates on his list of reasons for not wanting to go back. He has said from the start that he does not want to go back because the prospect of attending the American Academy stresses him out; because his father works too much; because his grandparents made remarks that hurt him. Months on, his views appear to have become no more nuanced than they were at the outset. But while in theory it is possible to argue that this rigidity reflects only his autism, not immaturity, in practice the two cannot be entirely separated in this case. N.E.'s black-and-white view of his father's response is undoubtedly shaped in part by his autism. So too is the depth of his entrenchment. Understanding that makes N.E.'s rapid turn against his father and his life in

Cyprus more legible. But it is an explanation, not evidence of maturity.

      Additionally, LaBonte bears significant responsibility for the extent of N.E.'s rigidity. It is the most natural thing in the world for a young child to wonder idly about living in a new place. That goes double for a child visiting a parent for the first time in years, and perhaps triple when that child has autism. LaBonte understandably wanted N.E. to stay. But she claims a decade of experience with autistic children. She should have known how important it was not to lead N.E. on, not to help him dig in. To be sure, at the outset she told him he had to go home. Here and there she acknowledged that this summer would not end the way he wanted. But from very early on in this ordeal, she advocated for N.E. to stay. If she did not say so explicitly, she implied to N.E. that they would work together to seek "a solution that's going to work for everybody." *Id.* at 708. Even when LaBonte and her mother were encouraging N.E. to keep answering Efthymiou's phone calls, their position was that maybe "he will start listening" and "the tide will turn." *Id.* at 261. LaBonte helped N.E. lose sight of the possibility that the "solution" might not be something everybody would agree on; that the tide might not turn. She is partly responsible for N.E.'s entrenchment, and it cannot be used to deny Efthymiou the return of his son.

      As Efthymiou repeatedly told N.E. over the course of the summer, a decision to stay in California and never return to Cyprus would be a big, important decision. It would have extraordinarily far-reaching consequences for his life. Perhaps it would be in N.E.'s best interest; that is not for this Court to decide. The Hague Convention leaves open the possibility that a mature child can make such a big decision unilaterally. But based on the extensive record in this case, including a lengthy discussion with him in chambers, N.E. has not yet reached an age and degree of maturity where he can make this decision for himself.

## Conclusion

      The petition is granted. N.E. is ordered returned to Cyprus in the custody of Costas Efthymiou. LaBonte must relinquish custody within seven days, and her counsel shall turn over N.E.'s passports directly to Efthymiou's counsel. In the event LaBonte files an emergency

motion for a stay with the Court of Appeals, this Court will consider a request to stay its ruling for an additional seven days to give the Court of Appeals a chance to consider the motion. But this Court will not impose a longer stay without agreement from both sides.

As the Court is ordering the return of a child pursuant to an action under 22 U.S.C. § 9003, it is required to order the respondent to pay necessary expenses incurred by the petitioner—including legal fees and transportation costs related to the return of the child—unless the respondent establishes that such order would be clearly inappropriate. § 9007(b)(3). LaBonte is directed to file an explanation addressing whether such an order would be clearly inappropriate within 21 days of this order. Efthymiou may file an optional response within 14 days of that filing. Both are limited to 10 pages.

**IT IS SO ORDERED.**

Dated: February 3, 2023

_____
VINCE CHHABRIA
United States District Judge